**Charles W. McDERMOTT, Plaintiff,**

v.

**CHILTON COMPANY, part of Capital Cities/ABC, Inc., and Michael Koehler, Defendants.**

**Civil Action No. 93–4971 (MTB).**

United States District Court,
D. New Jersey.

June 30, 1995.

John V. McDermott, Jr., Vernon, NJ, for Charles W. McDermott.

Christopher H. Mills, Collier, Jacob & Mills, PC, Somerset, NJ, for Chilton Company, Michael Koehler.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

Before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. The motion will be decided without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons that follow, defendants' motion will be granted.

### II. FACTS

At the heart of the instant dispute is the nature of the employment agreement between the parties and its subsequent termination by defendants. Set forth below are the undisputed facts that form the background of this case.

Plaintiff learned of a job opportunity with Chilton Company, a publisher of trade maga-

zines, in early 1988 upon reading a newspaper advertisement seeking applicants for a sales representative position. *Defendants' 12G Statement*, at 2. Plaintiff thereafter filled out an employment application which contained the following provision:

> I understand that in the event I am hired, and in the absence of a written agreement to the contrary, my status will be that of an employee at will, with no contractual right, express or implied, to remain in the Company's employ. I specifically agree that my employment may be terminated, with or without cause or notice, at any time at the option of either the Company or myself. I understand that no unauthorized representative may enter any agreement for employment or make any agreement contrary to the foregoing.

*Id.*, at 3. After an interview at Chilton headquarters, plaintiff was offered and accepted the position. *Id.*

Plaintiff began his employment on May 31, 1988. *Id.* Among the documents plaintiff completed that day was a form entitled "Post Employment Personal Summary", which contained a provision almost identical to that cited above. *Id.*, at 4. Plaintiff also received a Chilton Personnel Policies Manual from the personnel department. *Plaintiff's 12G Statement*, at 3. This manual included various disciplinary procedures employed by Chilton. *Id.*

Plaintiff's employment was terminated on September 11, 1992, apparently due in part to actions that resulted in the filing of a "publicity complaint" with the Business Publication Audit by another magazine publisher. *Defendants' 12G Statement*, at 6–8.

On September 10, 1993, plaintiff filed a complaint in the Superior Court of New Jersey, Law Division, Sussex County, naming Chilton Company and his former supervisor, Michael Koehler, as defendants. The action was subsequently removed to this court. Plaintiff charges defendants with wrongful termination (Count 1), sets forth a claim for wrongful and negligent supervision and evaluation against defendant Koehler (Count 2), and charges both defendants with negligently and tortiously interfering with his economic activity as a Chilton employee (Count 3).

Defendants have moved for summary judgment on all counts.

## III.  DISCUSSION

### A.  *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, "summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party has the initial burden of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). Once the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that summary judgment is inappropriate by coming forward with evidence to demonstrate that a material fact remains in dispute and must be resolved by the trier of fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B.  *Choice of Law*

Before determining whether summary judgment is appropriate in the instant case, however, this court is confronted with the hotly contested issue as to whether the law of New Jersey or Pennsylvania should be applied to the various claims set forth in plaintiff's complaint. Whether New Jersey or Pennsylvania law applies in this case is theoretically significant in that "New Jersey provides greater protection from the harsh effect of at-will termination" particularly where a discharged employee claims that a policy manual has altered the terms of the underly-

ing contractual agreement. *See Ramsbottom v. First Pennsylvania Bank, N.A.*, 718 F.Supp. 405, 408 (D.N.J.1989).

As a preliminary matter, federal courts must follow the choice of law rules of the forum state to determine the applicable substantive law that will govern. *Van Dusen v. Barrack*, 376 U.S. 612, 645–46, 84 S.Ct. 805, 823–24, 11 L.Ed.2d 945 (1964); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Accordingly, this court must look to New Jersey's choice of law rules.

New Jersey's choice of law rules are set forth in *State Farm Mutual Automobile Insur. Co. v. Simmons' Estate*, 84 N.J. 28, 417 A.2d 488 (1980), which dictates that the multifactor "most significant relationship" test described in the *Restatement (Second) of Conflict of Laws*, § 188 (1971) should be applied. The *Restatement* identifies seven general considerations that the *State Farm* court considered germane to a court's conflict-of-law analysis.[1] 84 N.J. at 34, 417 A.2d 488 (citing *Restatement*, § 6). The *State Farm* court accordingly held that "[c]ases in this jurisdiction subsequent to *Buzzone* [v. *Hartford Acc. & Indem. Co.*, 23 N.J. 447, 129 A.2d 561 (1957)] have not mechanically or inflexibly applied the *lex loci contractus* rule." *Id.*, at 36, 417 A.2d 488; *see also Ramsbottom*, 718 F.Supp. at 407 ("In contract cases, New Jersey courts apply the law of the place where the contract is made, 'unless the dominant and significant relationship of another state to the parties and the underlying issues dictate that this basic rule should yield.' ") (citing *State Farm*, 84 N.J. at 37, 417 A.2d 488). The wisdom of the "most significant relationship" test is particularly apparent in situations like that presented by the instant case where the exact place of contract formation is less than obvious.[2] Accordingly, an in-depth analysis pursuant to the "most significant relationship" test would normally be required.

As a preliminary matter, it should be noted that such an analysis does not lend itself to an easy conclusion given that the number of contacts with both New Jersey and Pennsylvania are numerous.[3] Although this court would, if required to reach this issue, hold that New Jersey law applied,[4] no such analysis is ultimately necessary because this court is presented with a "false conflict" inasmuch as summary judgment is appropriate under both New Jersey and Pennsylvania law.

## C. *The Breach of Contract Claim*

The crux of plaintiff's claim is that his at-will employment was altered by the conduct of defendants and that his termination was in violation of the conditions that had become incorporated into the "new" employment contract. Specifically, plaintiff claims that cer-

---

1. These factors include the following: (1) the needs of the interstate and international system; (2) the relevant policies of the forum; (3) the relevant policies of other affected states and the relevant interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied. *Id.*

2. In the instant case, plaintiff learned of the job opening from a Pennsylvania newspaper circulated in New Jersey, *Plaintiff's 12G Statement*, at 2–3, interviewed for the position at Chilton's Pennsylvania headquarters, *Defendants' 12G Statement*, at 2, but received his offer of employment by letter mailed to his New Jersey residence. *Plaintiff's 12G Statement*, at 3.

3. The primary contacts with Pennsylvania include the following: (1) the location of Chilton's headquarters; (2) the location of one of plain-

tiff's offices and his secretary; (3) the receipt by plaintiff of his initial training, documents and employment manual; (4) the location of plaintiff's interview; and (5) the location of virtually all of the decisions and meetings leading up to plaintiff's termination. *Defendants' 12G Statement*, at 2–9; *Defendants' Brief*, at 14–16. The primary contacts with New Jersey are as follows: (1) plaintiff, a New Jersey resident, was directed to develop untapped business in New Jersey; (2) the majority of plaintiff's working time was spent in New Jersey; (3) plaintiff's principal office was located in his New Jersey home; (4) the greatest proportion of plaintiff's mailings were directed to New Jersey locations; and (5) the greatest number of plaintiff's customers, who were all directed to contact him at his New Jersey residence, were located in New Jersey. *Plaintiff's 12G Statement*, at 2–6; *Plaintiff's Brief*, at 12–14.

4. This court would find that New Jersey law was applicable in that the majority of plaintiff's work was conducted within New Jersey and the core of his client base was within the state.

tain documents given to him by Chilton "constituted an employment contract under which defendants would treat him fairly and, in the event of unsatisfactory performance, comply with the disciplinary procedures set forth [t]herein." *Plaintiff's Brief*, at 3. Plaintiff claims that Chilton failed to adhere to these procedures in terminating him, and, accordingly, breached the employment contract. Plaintiff also claims that the Chilton Personnel Policies Manual transformed the employment contract into one under which employees could only be terminated for "just cause". Plaintiff then attempts to invoke the rules set forth in *Woolley v. Hoffmann–LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985), *modified,* 101 N.J. 10, 499 A.2d 515 (1985), *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 643 A.2d 546 (1994), and *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554 (1994), to fend off defendants' claim that any alleged conditions set forth in the employment manual cannot be deemed to have been incorporated into the employment contract in light of the disclaimer language contained therein.

■ Plaintiff's first line of argument, of course, assumes that the procedures set forth in the employment manual materially alter the terms of the original at-will agreement. However, a fair reading of that manual reveals that no such alteration is effected by the terms contained therein, at least in terms of the procedures to be followed in the event of a discharge. The Chilton Personnel Policies Manual which plaintiff received at the commencement of his employment and upon which he now relies contains the following brief "procedure" for the discharge of employees:

> **Discharge:** Discharge means separation for serious breach of Company policy or for insubordination, dishonesty or gross misconduct. If appropriate, an employee will be given a written reason; however, advance notice is not required.

*See Certification of David H. Ganz,* Ex. V. The only possible "procedure" that plaintiff can point to is the statement that an employee will be given written notice if appropriate. However, the manual does not state when written notice would be appropriate, nor does it explicitly require written notice. The possibility that a discharged plaintiff will be given the reasons for discharge in writing can hardly be said to constitute a "set of detailed procedures" like the one that led the *Woolley* Court to find that the employer had undertaken a binding obligation. 99 N.J. at 308, 491 A.2d 1257.

■ However, plaintiff's second claim—that the Manual converted the employment contract such that it was no longer "at-will" but allowed for termination only for "just cause"—merits closer attention. Put another way, plaintiff claims that he could only be terminated if the conditions set forth for "release" had been met or if he had committed acts of insubordination, dishonesty or gross misconduct or had seriously breached Company policy as required for "discharge".[5] Plaintiff contends that there remain factual issues in dispute as to whether his actions constituted grounds for discharge or release and thus summary judgment may not be granted.

On the surface, this argument seems to set forth a more colorable basis for the claim that the Chilton Personnel Policies Manual effectively transformed the terms of plaintiff's employment contract. After all, the list of circumstances for an employee's departure from Chilton listed in the Manual does not include the wide-ranging language that might be associated with at-will termination. It is the absence of such language that plaintiff invokes to suggest that the list implicitly promises that an employee will only be terminated for the reasons listed therein, i.e., for "just cause".[6]

---

**5.** Plaintiff seems to suggest that the termination of his employment might fall under either "release" or "discharge" as defined by the Manual. While the circumstances leading up to his termination would certainly seem to fall under "discharge", the resolution of this issue is inconsequential as summary judgment would be mandated in either event.

**6.** The term "just cause" is notably absent from the termination section of the Manual. This alone, however, would not necessarily doom plaintiff's claim for a transformation of contract terms. *See Preston v. Claridge Hotel & Casino,* 231 N.J.Super. 81, 86, 555 A.2d 12 (App.Div. 1989). However, most of the factors cited in *Preston* in support of that court's holding that the

Even assuming, *arguendo,* that this section might otherwise create a binding obligation or that there were sufficiently detailed procedures set forth in the Manual, plaintiff's claim must be dismissed in light of *Radwan v. Beecham Laboratories,* 850 F.2d 147 (3d Cir.1988). In *Radwan,* the plaintiff had received an employee manual at the commencement of his employment for the defendant company containing a provision entitled "Dismissal". That provision stated that "[d]ismissal for cause may include, but is not limited to, any of the following violations", after which were listed six general areas of conduct that would result in dismissal. Apparently, the employee manual contained no disclaimer stating that the company retained the right to terminate employment at will.

Nonetheless, the court held that the employee manual could not alter the terms of the at-will employment contract in light of certain documents signed by plaintiff in connection with his employment application. That application provided as follows:

> I authorize investigation of all statements contained in this application. I understand that misrepresentation of facts called for is cause for dismissal. Further, I understand and agree that my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without previous notice.

*Radwan,* 850 F.2d at 148–49. The *Radwan* Court found this language sufficient to preclude the possibility that an employee manual could transform the at-will contract into something else.

> Here, unlike in *Woolley,* the question of the employee's tenure was specifically dealt with in writing when he was hired, for Radwan in his employment application agreed that he could be discharged at any time without previous notice. *See* 99 N.J. at 285, 491 A.2d 1257. Further, nothing in Radwan's application suggested that Beecham's right to discharge him was dependent upon his conduct or job performance. While this application was not part of the employees manual, we do not understand *Woolley* to require that disclaimers of an intent to bind an employer not to discharge an employee must be in the employees manual and not in an individual agreement.... In view of Radwan's acceptance of a term of employment providing without qualification that he could be terminated at any time without previous notice, he could hardly have any reasonable expectation that Beecham's manual granted him the right only to be discharged for cause.

*Radwan,* 850 F.2d at 150.

The case presented to this court is indistinguishable from that presented in *Radwan* for all practical purposes. When plaintiff began his employment with Chilton, he signed an application form that contained language that unmistakably evidenced an agreement that was terminable at will:

> I understand that in the event I am hired, and in the absence of a written agreement to the contrary, my status will be that of an employee at will, with no contractual right, express or implied, to remain in the Company's employ. I specifically agree that my employment may be terminated, with or without cause or notice, at any time at the option of either the Company or myself. I understand that no unauthorized representative may enter any agreement for employment or make any agreement contrary to the foregoing.

*Certification of David H. Ganz,* Ex. A. On plaintiff's first day of work with Chilton, he also filled out and signed a document entitled "Post Employment Personal Summary" that contained a virtually identical passage just above the signature line of the form. *Id.,* Ex. C. Under *Radwan,* plaintiff cannot then "have [had] any reasonable expectation that [Chilton's] manual granted him the right only to be discharged for cause." 850 F.2d at 150.[7] Accordingly, plaintiff's breach of con-

---

Claridge Employee Handbook created a "just cause" provision are absent here. Moreover, this case is clearly distinguishable under *Radwan v. Beecham Laboratories,* 850 F.2d 147 (3d Cir. 1988).

7. Although *Radwan* was decided under New Jersey law, this court has little doubt but that the same result would be mandated under Pennsylvania law. After all, Pennsylvania law is considerably less conducive to claims that an employee handbook's provisions will transform an at-will

tract claim fails as a matter of law, even under New Jersey law.[8]

■ Finally, plaintiff's contract claim may be quickly disposed of insofar as it alleges a breach of good faith and fair dealing. Under New Jersey law, an implied covenant of good faith and fair dealing may not be invoked to restrict the authority of employers to fire at-will employees. *Citizens Bank of New Jersey v. Libertelli,* 215 N.J.Super. 190, 194, 521 A.2d 867 (App.Div.1987); *see also, Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1103 (D.N.J.1988) ("The Appellate Division of the Superior Court of New Jersey appears to have rejected the proposition that there is an implied covenant of good faith and fair dealing between an employer and an employee in an at-will situation."); *D'Allessandro v. Variable Annuity Life Insurance Co. (VALIC),* 1990 WL 191914 *6 (D.N.J.), *aff'd* 937 F.2d 596 (3d Cir.1991) ("This court thus holds that no implied covenant in good faith and fair dealing in at-will contracts is recognized in New Jersey as to the employer's ability to

terminate employees at anytime pursuant to an at-will provision.") [9]

### D. *Plaintiff's Tort Claims*

The final two counts of plaintiff's complaint allege tort-based causes of action for negligent supervision and evaluation of the plaintiff by defendant Koehler and for negligent and tortious interference with economic opportunity by both Koehler and Chilton Company.

■ The first of these claims may be quickly dismissed. An action for negligent evaluation "has not been recognized in New Jersey, and has been rejected by most courts that have considered it." *Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940, 954–55, n. 8 (D.N.J.1991) (citing *Mann v. J.E. Baker Co.,* 733 F.Supp. 885, 887 (M.D.Pa.1990) (finding that no such cause of action exists under Pennsylvania law)).

■ Plaintiff's claim that defendants Chilton Company and Koehler tortiously in-

employment contract into one under which termination may only be invoked for "just cause". *See Raines v. Haverford College,* 849 F.Supp. 1009, 1012 (E.D.Pa.1994); *Ritter v. Pepsi Cola Operating Co.,* 785 F.Supp. 61, 64 (M.D.Pa.1992) ("In Pennsylvania, there is a very strong presumption of at-will employment relationships and the level of proof required to overcome this presumption is arduous."); *Reilly v. Stroehmann Bros. Co.,* 367 Pa.Super. 411, 416, 532 A.2d 1212 (1987) ("A handbook, to be construed as a contract, must contain unequivocal provisions that the employer intended to be bound by it and, in fact, renounced the principle of at-will employment.") Further, the standard for scrutinizing disclaimers allows such statements to be framed in "legalese" that would be deemed ineffective under New Jersey law. *See Rutherfoord v. Presbyterian–Univ. Hosp.,* 417 Pa.Super. 316, 612 A.2d 500 (1992) (disclaimer stating that guidelines "are a summary of the [Hospital Manual] and group benefits policies with insurance companies, and are not intended to be a legal contract" deemed effective). Thus, there is no reason to believe that, under Pennsylvania law, a document signed by an employee that stated that the employment contract was at-will would not preclude him from later arguing that an employment manual provision had altered that contract term.

8. Plaintiff also cites a variety of other documentation in support of his claim that Chilton had converted his employment contract such that he could only be terminated for just cause. *See*

*Certification of David H. Ganz,* Exs. S and T, *Certification of Charles W. McDermott,* Exs. A, B, C, D, E, F, H, I, J, and K. As a preliminary matter, these documents cannot be fairly read to create any expectation that termination will be only for "just cause". Only three of these documents even mention termination, and these are merely copies of the "Terms and Conditions of Employment for Space Sales Representatives" memo that were sent to plaintiff on different dates. While termination is mentioned, there is no attempt to set forth the grounds for termination in those memos. Thus, they cannot form the basis of a claim that plaintiff's at-will contract has been transformed into a "termination for just cause" agreement. Even if they could be so used, *Radwan* would be equally as applicable to these documents as to an employment manual.

9. This is not to say that there is no implied covenant of good faith and fair dealing within an at-will contract, at least as to terms other than duration. *See Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940, 955 (D.N.J.1991) ("However, an implied obligation of good faith is applicable to those aspects of the employer/employee relationship which are governed by some contractual terms, regardless whether that relationship is characterized generally as being 'at will'.") Nevertheless, plaintiff can point to no terms of this contract regarding conditions of termination or procedures thereof that may form the basis of a claim for breach of good faith and fair dealing.

terfered with his economic opportunity must also be dismissed. To begin with, "New Jersey law clearly establishes that an action for tortious interference cannot be maintained 'where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship'." *Fregara,* 764 F.Supp. at 955 (quoting *Sandler v. Lawn–A–Mat Chemical & Equipment Corp.,* 141 N.J.Super. 437, 450, 358 A.2d 805 (App.Div.1976), *cert. denied,* 71 N.J. 503, 366 A.2d 658 (1976)). *See also, Cappiello v. Ragen Precision Industries, Inc.,* 192 N.J.Super. 523, 529, 471 A.2d 432 (App.Div.1984) (employer cannot interfere with its own employment contract).[10] Accordingly, defendant Chilton could not, as a matter of law, have interfered with its own contract with plaintiff, and the claim must be dismissed as to this defendant.

 This claim must also be dismissed as to defendant Koehler because an agent of an employer cannot tortiously interfere with the employment contract between his employer and a co-employee. This claim has already been visited twice by district courts for the District of New Jersey and has been twice rejected. In *Obendorfer v. Gitano Group, Inc.,* 838 F.Supp. 950, 956, n. 2 (D.N.J.1993), the court applied the reasoning of the Third Circuit in *Michelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005, 1007–1008 (3d Cir.1987), which was decided under Pennsylvania law, because "[u]nder the law of both [New Jersey and Pennsylvania], to maintain a tortious interference claim, plaintiff must allege that a third party interfered with a contractual relationship, and under the law of both jurisdictions a corporation can only act through its agents and officers." Similarly, the *Fregara* court held as follows:

> In this case, plaintiff cannot maintain an action for tortious interference against his own employer, Jet Aviation. Jet cannot interfere with its own employment relationship with plaintiff. Similarly, plaintiff's supervisors, Kunert and Baillif, the individual defendants, were not interlopers or

third parties to Jet's employment relationship with plaintiff.... The alleged tortious activities of Kunert and Baillif were undertaken in their capacity as supervisors and agents of Jet. Where, as here, the employer ratified and participated in the conduct complained of, [i.e., the termination of plaintiff's employment] there exists no question but that the employer acted through its agents. Thus, as agents of Jet, Kunert and Baillif cannot be viewed as third parties or interlopers and could not have committed the tort of malicious interference with economic benefit.

764 F.Supp. at 955. Accordingly, plaintiff's claims against supervisor Koehler for tortious interference with economic opportunity must be dismissed along with the identical claim against his former employer, Chilton Company.

### IV. CONCLUSION

As set forth above, summary judgment must be granted in favor of defendants on each of the three counts set forth in plaintiff's complaint regardless of whether New Jersey or Pennsylvania law is applied.

An appropriate order shall issue.

### *ORDER*

This matter having come before the court upon the motion of defendants for summary judgment pursuant to Fed.R.Civ.P. 56, and the court having considered the submissions of the parties without oral argument pursuant to Fed.R.Civ.P. 78; and

for the reasons expressed in this Court's opinion of even date;

IT IS on this 30th day of June, 1995

ORDERED the defendants' motion for summary judgment is hereby granted.

---

10. This proposition is equally true under Pennsylvania law. *See Michelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005, 1007–1008 (3d Cir.1987) ("It is also settled law that ... a party cannot be liable for tortious interference with a contract to which he is a party.")